UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.  25cr10027 |
| v. | Violation: |
| DONALD NCHAMUKONG | <u>Count One</u>:   Conspiracy to Smuggle Goods into the United States, to Commit Loan Fraud, and to Distribute Controlled Substances (18 U.S.C. § 371) |
| Defendant | |
| | <u>Forfeiture Allegation</u> (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

<u>INFORMATION</u>

At all times relevant to this Information:

<u>General Allegations</u>

1.      Starting no later than 2019 and continuing until at least 2022, Defendant DONALD NCHAMUKONG conspired with Doyal Kalita and others to distribute drugs to persons in the United States over the internet and through the use of India-based call centers.

2.      Initially, NCHAMUKONG and Kalita opened shell companies and bank accounts to facilitate sales for an India-based drug dealer, Co-conspirator 1 ("CC1") who fraudulently shipped illegal prescription drugs, including controlled substances, into the United States.

3.      NCHAMUKONG and Kalita later received illegally imported controlled substances, repackaged them, and reshipped them to customers in the United States, including Massachusetts.   These shipments included the Schedule IV opioid, Tramadol, among other drugs.

4.      When the COVID-19 pandemic hit the United States, NCHAMUKONG and Kalita fraudulently obtained a pandemic relief loan from the United States Small Business Administration

("SBA") to subsidize their criminal activity, first obtaining about $34,000 in 2020 and then another $166,000 in 2021.

*The Conspirators*

5.      NCHAMUKONG lived in Michigan, where he controlled Truzipex LLC ("Truzipex"), a purported e-commerce business, and GAD Auto Parts LLC ("GAD Auto"), a purported used car parts distributor, in furtherance of the conspiracy.   NCHAMUKONG was not a pharmacist and was not registered as a drug importer.

6.      Doyal Kalita lived in Michigan, where he controlled ZD Marketing Group LLC ("ZD Marketing"), a purported e-commerce company.   Kalita was not a pharmacist and was not registered as a drug importer.

7.      CC1 lived in India and sold illegal pharmaceuticals over the internet to persons in the United States.

8.      Co-conspirator 2 ("CC2") lived in Poland and operated an online pharmacy that illegally sold drugs to persons in the United States.

*Importation of Pharmaceutical Products*

9.      Tapentadol is Schedule II controlled narcotic opioid that may be distributed in the United States only in United States Food and Drug Administration ("FDA") approved formulations to customers with valid prescriptions.

10.     Tramadol, Carisoprodol, and Alprazolam are Schedule IV controlled substances that that may be distributed in the United States only in FDA-approved formulations to customers with valid prescriptions.   Tramadol is an opioid painkiller.   Carisoprodol is non-opioid painkiller. Alprazolam is a sedative.

11.    Sildenafil citrate, also known as Viagra, Butalbital, also known as Fioricet, and Valacylovir, also known as Valtrex are non-controlled drugs available for sale in the United States only in FDA-approved formulations and by prescription.    Sildenafil citrate treats erectile dysfunction, Fiorecet treats headache pain, and Valtrex is an anti-viral.

*The EIDL Program*

12.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March, 2020, to provide financial aid to businesses during the COVID-19 pandemic.    The CARES Act expanded the SBA's existing EIDL program to provide relief to small businesses that experienced a loss in revenue during the pandemic.    The program provided low interest loans to pay for expenses that could have been met had the pandemic not occurred. Eligible expenses included payroll, paid sick leave, increased production costs due to supply chain disruptions, and business obligations such as debts, rent, and mortgage payments.

13.    A qualifying business submitted an EIDL application to the SBA and attested, among other things, that it was not engaged in any illegal activity.    EIDL loan funds had to be spent on payroll, sick leave, production costs, and specified business expenses.

Object and Purposes of the Conspiracy

14.    The objects of the conspiracy were (a) fraudulently and knowingly to import or bring into the United States prescription drugs and controlled substances, contrary to law; (b) to receive, sell, and facilitate the sale of the illegal pharmaceutical products after importation; (c) illegally to distribute controlled substances, including Tapentadol, Tramadol, Carisoprodol, and Alprazolam; and (d) knowingly to make false statements in loan applications for the purpose of influencing the actions of the SBA in administering the EIDL program.

15.     The purposes of the conspiracy were to enrich the co-conspirators and to evade detection by law enforcement and financial institutions.

<u>Manner and Means of the Conspiracy</u>

16.     Among the manner and means by which NCHAMUKONG, Kalita, and co-conspirators known and unknown to the U.S. Attorney carried out conspiracy were the following:

a.     Engaging overseas call centers to sell prescription drugs, including Schedule II and Schedule IV controlled substances to persons in the United States, including in Massachusetts;

b.     Importing drugs into the United States in a manner to evade detection by United States Customs;

c.     Importing drugs in formulations not approved by the FDA for distribution to persons without valid prescriptions, thus impairing, obstructing, or defeating the lawful function of the FDA;

d.     Receiving, repackaging, and distributing illegally imported pharmaceuticals, imported Schedule II and Schedule IV controlled substances;

e.     Registering and controlling businesses for the purpose of opening bank accounts and merchant accounts to handle the proceeds of illegal drug sales;

f.     Opening, controlling, and using merchant and other financial accounts to process credit card transactions on behalf of call centers in India in a manner designed to conceal the true nature of the drug transactions;

g.     Wiring proceeds from the illegal drug sales to drug suppliers overseas; and

h.     Fraudulently applying for and obtaining an EIDL loan to fund the illegal drug importation scheme.

## Acts in Furtherance of the Conspiracy

17.     Between at least as early as in or about January 2019 and in or about April 2022, NCHAMUKONG, Kalita, and others known and unknown to the U.S. Attorney, committed the following overt acts, among others, in the District of Massachusetts and elsewhere in furtherance of the conspiracy:

18.     On or about April 25, 2019, Kalita messaged NCHAMUKONG, "We need to create a company and open a bank account."

19.     On or about May 3, 2019, as part of a message chain in which Kalita and CC1 were reconciling drug sales through Kalita's existing ZD Marketing merchant account, CC1 told Kalita that he was due $18,288 and that Kalita had missed some sales including a sale of "Tapenta[dol]."

20.     On or about May 8, 2019, NCHAMUKONG registered Truzipex, in Michigan, as an e-commerce company.

21.     On or about May 17, 2019, Kalita directed NCHAMUKONG to use Truzipex business documents to open a bank account in the company's name.

22.     On or about May 21, 2019, Kalita messaged NCHAMUKONG, "Please go to the bank today bro!   I got the clients waiting."

23.     On or about the same day, NCHAMUKONG opened a bank account for Truzipex.

24.     On or about May 24, 2019, NCHAMUKONG opened a merchant account for Truzipex and linked it to the company's new bank account.

25.     On or about May 25, 2019, Kalita gave CC1 the login and account information for the Truzipex merchant account.

26.     On or about the same day, NCHAMUKONG and Kalita accepted payment from a prescription drug customer through the Truzipex merchant account.

27.    On or about May 30, 2019, Kalita messaged NCHAMUKONG, "Bro need to stop by!  Or you can com to office?  We need to pay to the center."

28.    On or about May 31, 2019, after receiving $2,188.92 in payment card sales proceeds through the Truzipex merchant account, NCHAMUKONG transferred $1,926 to one of Kalita's bank accounts.

29.    On or about June 4, 2019, Kalita and NCHAMUKONG discussed opening additional merchant accounts so that they could handle a higher volume of sales.

30.    On or about June 18, 2019, NCHAMUKONG and Kalita discussed modeling their business on Amazon's online pharmacy, Pillpack.com.

31.    On or about July 8, 2019, CC1 sent Kalita records for two sales of Butalbital.

32.    On or about July 10, 2019, NCHAMUKONG and Kalita accepted payment from the sale of Valtrex to a customer in Braintree, Massachusetts, through the Truzipex merchant account.

33.    On or about July 17, 2019, Kalita told NCHAMUKONG that they had "tons of sales pending" and already had $10,000 in sales.

34.    On or about August 9, 2019, NCHAMUKONG registered GAD Auto, his purported automotive parts supplier, in Delaware.

35.    On or about August 14, 2019, NCHAMUKONG opened a PayPal account in the name of GAD Auto.

36.    On or about September 13, 2019, Kalita told CC2, an overseas drug dealer, that CC2 could sell prescription drugs including "ED" and Fioricet and use Kalita and NCHAMUKONG's payment card processing services.

37.     On or about October 11, 2019, NCHAMUKONG wired $1,488 from his Truzipex account to CC1's drug supplier in India.

38.     On or about February 3, 2020, NCHAMUKONG wired $4,500 to a drug supplier in Singapore.

39.     On or about February 9, 2020, Kalita messaged NCHAMUKONG, "We don't want to give [a drug dealer] the center info or he would go straight to them and work directly with them. We are the middle man and that's how we make money doing no work."

40.     On or about the same day, after NCHAMUKONG told Kalita that a drug-selling co-conspirator wanted verification of Viagra shipments, Kalita reassured NCHAMUKONG, "All were provided."

41.     On or about February 10, 2020, Kalita told NCHAMUKONG to tell a drug-selling co-conspirator that the shipments were "coming from Singapore and fulfilled by USPS."

42.     On or about March 10, 2020, Kalita told NCHAMUKONG that they would start shipping drugs themselves in Michigan.

43.     On or about March 25, 2020, Kalita told NCHAMUKONG that they could qualify for pandemic relief funds through an SBA program.

44.     On or about April 2, 2020, Kalita, copying NCHAMUKONG, applied to a new merchant account provider for an account for Truzipex, which he had identified as selling pharmaceuticals, including erectile dysfunction drugs, without an "RX license."

45.     On or about April 4, 2020, NCHAMUKONG applied for an EIDL loan on behalf of  Truzipex LLC.  On the application, NCHAMUKONG falsely attested, among other things, that Truzipex was not engaged in any illegal activity and was a timeshare business.

46.     On or about April 8, 2020, NCHAMUKONG and Kalita sold 180 pills of 50mg "Overseas Tramadol" for $220 to a customer in Peabody, Massachusetts, through GAD Auto's PayPal account.

47.     On or about April 11, 2020, NCHAMUKONG and Kalita sold 180 pills of 50mg "Overseas Tramadol" for $220 to a customer in Stockbridge, Massachusetts, through GAD Auto's PayPal.

48.     On or about April 12, 2020, NCHAMUKONG confirmed that he had received a package of pills at his home.

49.     On or about April 14, 2020, NCHAMUKONG and Kalita sold 360 pills of 100mg Tramadol for $460 to a customer in Andover, Massachusetts, through the GAD Auto PayPal.

50.     On or about the same day, Kalita sent NCHAMUKONG an instructional video, featuring Kalita, showing NCHAMUKONG how to repackage and ship boxes of illegally imported Tramadol and including the image below of "OL-TRAM," which is a formulation of Tramadol not approved by the FDA for use in the United States:



51.     On or about April 15, 2020, NCHAMUKONG told Kalita that he had the necessary supplies and was "all set and ready to ship."

52.     On or about April 21, 2020, NCHAMUKONG emailed Kalita sales records for drugs sales on April 13 and 14, 2024, including records for the sale of "Overseas Tramadol."

53.     On or about May 7, 2020, KALITA messaged CC2 that they had four drug sales through the GAD Auto PayPal account, including a $350 sale of 250 100mg pills of foreign-produced Tramadol to a customer in Pembroke, Massachusetts.

54.     On or about July 1, 2020, on behalf of Truzipex, NCHAMUKONG executed an EIDL agreement for a loan of $34,000 from the SBA.   NCHAMUKONG falsely certified in the agreement, among other things, that Truzipex would only use the EIDL proceeds as working capital to alleviate harm from the pandemic and that all representations in Truzipex's EIDL application were true.

55.     On or about July 8, 2020, after receiving several transfers from a Truzipex account, Kalita wired $3,000 from his ZD Marketing account to a Hong Kong drug supplier's overseas account.

56.     On or about July 14, 2020, after receiving a transfer from the SBA of $33,900 to fund Truzipex's EIDL loan, NCHAMUKONG transferred $33,900 to Kalita's ZD Marketing accounts.

57.     On or about July 15, 2020, after receiving a transfer of EIDL funds from Truzipex, Kalita wired $4,542 from his ZD Marketing account to a Hong Kong drug supplier's overseas account.

58.     On or about October 18, 2020, NCHAMUKONG and Kalita sold 180 pills of 100mg "Overseas Tapentadol" for $250 to a customer in Chicopee, Massachusetts.

59.    On or about June 16, 2021, Kalita put NCHAMUKONG in direct contact with CC1 so that NCHAMUKONG could better coordinate payments to CC1.

60.    On or about July 12, 2021, Kalita told NCHAMUKONG to wire drug proceeds to the overseas account of a drug supplier in Hong Kong.

61.    On or about July 13, 2021, NCHAMUKONG wired $8,243 from a Truzipex account in the United States to a Hong Kong drug supplier's overseas account.

62.    On or about August 4, 2021, NCHAMUKONG messaged CC1, "I see sales has been low, can you ramp it up.  I know there has been some delays but don't worry you will be paid bro."

63.    On or about August 18, 2021, at Kalita's request, NCHAMUKONG wired $8,500 from Truzipex's account in the United States to the Hong Kong drug supplier's overseas account.

64.    On or about August 25, 2021, Kalita told NCHAMUKONG that they had made $15,727 so far that week, that they would hit $25,000 for the week, that is was "easy mullah," and that they had already paid CC2, so NCHAMUKONG only needed to pay Kalita.

65.    On or about September 13, 2021, CC1 asked Kalita and NCHAMUKONG to pay a supplier with cryptocurrency for a shipment of blue Fioricet.

66.    On or about September 29, 2021, after Kalita shared sales data for the week, NCHAMUKONG wired $13,793.54 from a Truzipex account to the Hong Kong drug supplier's overseas account..

67.    On or about October 13, 2021, after Kalita shared sales data for the week, NCHAMUKONG wired $14,362.37 from Truzipex's account to the Hong Kong drug supplier's overseas account.

68.     In about January 2022, NCHAMUKONG submitted a request to the SBA to increase the amount of Truzipex's EIDL loan.

69.     On or about February 3, 2022, NCHAMUKONG executed a new EIDL agreement with the SBA to increase Truzipex's loan by $166,000 to $200,000; in the agreement, he falsely certified, among other things, that the loan proceeds would be used for working capital to alleviate economic injury caused by the pandemic.

70.     On or about April 19, 2022, after receiving $166,000 in a Truzipex account from the SBA as an increase to Truzipex's EIDL loan, NCHAMUKONG wired $92,500 to Kalita's ZD Marketing account and to an LLC.

71.     On or about April 30, 2022, NCHAMUKONG withdrew $30,000 from the account that received the EIDL loan increase.

72.     On or about May 4, 2022, NCHAMUKONG wired $25,000 out of the account that received the EIDL loan increase.

<u>COUNT ONE</u>
Conspiracy to Smuggle Goods into the United States, to Commit Loan Fraud,
and to Distribute Controlled Substances
(18 U.S.C. § 371)

The U.S. Attorney charges:

73.    The U.S. Attorney re-alleges and incorporates by reference paragraphs 1-72 of this Information.

74.    From in or about April 2019 to in or about May 2022, in the District of Massachusetts, and elsewhere, the defendant,

DONALD NCHAMUKONG,

conspired with others known and unknown to the U.S. Attorney to commit offenses against the United States, to wit:

a.    fraudulently or knowingly to import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545;

b.    knowingly to make any false statement for the purpose of influencing in any way the action of the SBA in connection with the EIDL program upon any application, commitment, loan, or agreement, in violation of Title 18, United States Code, Section 1014; and

c.    knowingly and intentionally to distribute and possess with intent to distribute Tapentadol, a Schedule II controlled substance, and Tramadol, Carisoprodol, and Alprazolam, all Schedule IV controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and (b)(2), and Title 18, United States

Code, Section 2;

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

78.     Upon conviction of the offense of conspiracy to smuggle goods into the United States, to commit loan fraud, and to distribute controlled substances in violation of Title 18, United States Code, Section 371, set forth in Count One, the defendant,

### DONALD NCHAMUKONG

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

79.     If any of the property described in Paragraph 78, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 78 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:     /s/Kriss Basil
        KRISS BASIL
        Assistant United States Attorney